**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PARICHEHR FARZAM, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 12-35 (RMC) |
| | ) |
| JEFFREY SHELL, CHAIRMAN, THE | ) |
| BROADCASTING BOARD OF | ) |
| GOVERNORS | ) |
| | ) |
| Defendant.[1] | ) |
| | ) |

**MEMORANDUM OPINION**

This case revolves around assignments given (and not) to a television reporter at the Voice of America's Persian News Network, an entity under the Board of Broadcasting Governors.  Reporter Parichehr Farzam alleges that she was retaliated against for filing complaints that VOA violated the Equal Pay Act and Title VII of the Civil Rights Act of 1964.  The Court earlier transferred two counts to the Court of Federal Claims, Dkt. 99, and the Board now moves for summary judgment on the two remaining counts after discovery.  Based on undisputed facts, the Court will grant the motion.

## I.  FACTS

None of the following facts is in genuine dispute.  Ms. Farzam is a United States citizen who was born and lived in Iran until she came to the United States at the time of the Iranian Revolution in 1979.  Ms. Farzam worked in various capacities in the Iranian government

---

[1] Mr. Shell, the present Chairman of the Broadcasting Board of Governors, is substituted for the original defendant, Walter Isaacson.  *See* Fed. R. Civ. P. 25(d).  The Court refers to the Defendant as the Board in this opinion.

before the Revolution, including in the Prime Minister's office as executive director of Taavon,

an official government magazine that covered agricultural policies.  In 2000, she began working

as a contract employee in VOA's Persian Service, a radio broadcast service, covering the 2000

presidential election.  She became a full-time employee of VOA in 2001.

Defendant Jeffrey Shell is the chairman of the Broadcasting Board of Governors

(the Board), an agency of the United States Government that distributes news via radio,

television, internet, and other media sources to individuals around the world through

broadcasters such as Voice of America (VOA).  VOA now has a Central News Desk that gathers

news and disseminates it to VOA's approximately 45 different language services.  Def.

Statement of Material Facts [Dkt. 56] (Def.'s Facts) ¶ 14.  The Central News Desk has two (2)

White House correspondents who gather information and provide it to the individual language

services to translate and use in its television news content as each language service deems

appropriate.  *Id.* ¶ 15.

In 2004, Ms. Farzam and other employees of the Persian Service were detailed to

work at Radio Farda, which was part of Radio Free Europe and used employees from the British

Broadcasting Corporation (BBC) and VOA.  During this time, Ms. Farzam and her colleagues

continued to be paid by VOA but received directions and day-to-day assignments from Radio

Farda.  While working at Radio Farda (although based in the United States), Ms. Farzam served

as a radio broadcaster whose responsibilities included covering the White House.  She therefore

qualified for a "hard pass" as an accredited news representative to the White House.  Ms. Farzam

also held press credentials from the State Department and Congress.  Ms. Farzam occasionally

traveled with the White House press corps and covered the 2004 presidential election and the

2006 mid-term elections for Radio Farda.  In March 2008, she conducted a radio interview of

President George W. Bush in the White House, with a colleague from VOA.

In March 2006, while on detail to Radio Farda, Ms. Farzam filed an equal employment opportunity (EEO) complaint against the Board, alleging gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, § 2000e-3(a), retaliation,[2] and unequal pay under the Equal Pay Act, 29 U.S.C. § 206, § 215(a)(3).  The charge was resolved on March 26, 2008 when both parties agreed to a settlement that provided for Ms. Farzam's promotion to a GS-12 grade (retroactive to April 2004); designated within-grade and quality-step increases through April 2007 with a further step increase in 2009; back pay, overtime pay, and any applicable retirement benefits; and attorney fees and costs of $ 9,000. Def. Mem., Ex. 78 [Dkt., 59-15] (2008 Settlement Agreement).  The agreement, signed while Ms. Farzam was still on detail to Radio Farda, was executed for the Board by the Director of the Persian News Network, Sheila Gandji, among others.

All employees of the Board ended their details to Radio Farda in 2008 and returned to work at the Persian News Network (PNN), formerly the Persian Service.  Upon her return to the Persian News Network on July 8, 2008, Ms. Farzam was asked to make the transition from radio broadcaster to television news reporter as part of her new job duties and responsibilities.  She was also assigned to the PNN's flagship news program, "News and Views."

Ms. Farzam complains that she was then "disallowed from continuing to report from the White House, had reporting assignments and reports disallowed and not broadcast, and was subjected to other responsibility and work product curtailments and diminutions . . . in

---

[2]   The record does not reveal what Ms. Farzam's pre-2006 EEO activity might have been.  Title VII was amended in 1972 to cover the federal government, from whom a plaintiff may seek compensatory damages but not punitive damages.  *See* 42 U.S.C. § 1981(b)(1);  *see also Marcus v. Geithner*, 813 F. Supp. 2d 11. 21 (D.D.C. 2011); *McAlister v. Potter*, 733 F. Supp. 2d 134, 146 (D.D.C. 2010).

retaliation for her prosecution of her 2006 [Title VII and Equal Pay Act] complaint."  Pl. Opp'n

to Def. Mot. Summ. J. [Dkt. 59] (Opp'n) at 3.  Specifically, she alleges the following series of

retaliatory acts:

- After the Settlement Agreement, the Board "engaged in additional acts of retaliation."  Am. Compl. ¶ 10;

- After July 2008 and "up until several months ago," Ms. Farzam's "efforts to initiate work projects and undertake corresponding activities . . . were in numerous instances resisted.  She was limited in large part to doing translations and preparing the contents of packages for television" or given no assignments at all.  *Id.* ¶ 11;

- After her return to VIOA in July 2008, Ms. Farzam was not allowed to travel to cover domestic or international conferences, including G-8 and G-20 conferences, although less experienced colleagues were allowed to cover some of those meetings.  *Id.* ¶ 12;

- After her return to VOA in July 2008, Ms. Farzam was not provided necessary audio equipment to record interviews.  *Id.* ¶ 13;

- "[U]p until several months ago," the Persian News Network "failed to broadcast reports Plaintiff prepared," including stories on President-Elect Obama's visit to President Bush just before the inauguration on January 20, 2009 and a report on a news conference held by the First Lady Michelle Obama.  *Id.* ¶ 14;

- In November 2008, the Persian News Network created a special team for covering inauguration events (in January 2009) but failed to include Ms. Farzam despite her experience.  *Id.* ¶ 15;

- The Persian News Network failed to renew Ms. Farzam's credentials for press coverage of the White House, State Department, or Congress, as those credentials expired in February 2009, March 2009, and April 2009, respectively.  *Id.* ¶ 16;

- On August 26, 2010, the Persian News Network did not approve Ms. Farzam's request to cover Congressman Chris Van Hollen at the National Press Club and the Persian News Network failed to respond timely to her request to cover a Q&A news conference by Senators John Cornyn and Robert Menendez to be held on September 30, 2010, so that she was unable to do so.  *Id.* ¶ 17;

- On November 3, 2010, Ms. Farzam was required to attend a refresher course in journalism and preparing packaging, along with many new employees, although she had been doing these tasks for many years at VOA.  *Id.* ¶ 18;

- On November 16, 2010, Ms. Farzam informed her supervisor that she had independently attended the award ceremony of a National Medal by President Barack Obama and prepared a report, with exclusive photos, but her supervisor refused to use her report and assigned it to another employee who had not attended the ceremony.  *Id.* ¶ 19;

- The Persian News Network changed Ms. Farzam's status in January 2011 from essential to non-essential employee without prior notice.  She alleges that "[n]on-essential employees can be subjected to reductions in force more easily than essential employees."  *Id.* ¶ 20.

Ms. Farzam contacted an EEO counselor about alleged retaliation on August 18, 2010 and filed a formal complaint on November 19, 2010.  Opp'n at 3.

The instant lawsuit was filed on January 10, 2012; Ms. Farzam filed an Amended Complaint on February 7, 2012 before an Answer was filed.  The Amended Complaint originally asserted four separate counts: (1) retaliation in violation of the Equal Pay Act of 1963, 29 U.S.C. § 206(d); (2) retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e[]; (3) breach of the 2008 Settlement Agreement; and (4) unequal pay in violation of the Equal Pay Act, 29 U.S.C. § 2069(d).

On November 21, 2012, pursuant to *United States v. Tohono O'Odham Nation,* 131 S. Ct. 1723, 1727 (2011), this Court transferred Counts III and IV of the Amended Complaint to the U.S. Court of Federal Claims and retained only Counts I and II.  *See Farzam v. Isaacson*, 905 F. Supp. 2d 95 (D.D.C. 2012).  Importantly, Counts I and II no longer include Ms. Farzam's claim that the Board's alleged breach of the Settlement Agreement was itself a retaliatory act.  *See id.* at 97 ("Due to this transfer, this Court will not consider facts concerning the breach of the settlement agreement as a basis for retaliation because such facts are based on 'substantially the same operative facts' as the breach-of-contract claim.") (quoting *Tohono O'Odham Nation*, 131 S. Ct. at 1731).  The remaining allegations of retaliation are therefore only those alleged in paragraphs 10-20 of the Amended Complaint, specified above.  Because

paragraph 10 of the Amended Complaint merely presents a generalized accusation of "additional acts of retaliation," however, the focus properly belongs on paragraphs 11-20, analyzed below.

The Board moved for summary judgment on July 18, 2014 which Ms. Farzam opposes. After full discovery and briefing, the matter is ripe for decision.

## II. LEGAL STANDARDS

### A. Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Summary judgment is appropriate if the evidence "is merely colorable, or is not significantly probative," *Anderson*, 477 U.S. at 249-50 (citations omitted), or if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

District courts use "special caution" when considering summary judgment in

employment discrimination or retaliation actions due to "the potential difficulty for a plaintiff . . .

to uncover clear proof of discriminatory or retaliatory intent." *Nurriddin v. Bolden*, 40 F. Supp.

3d 104, 115 (D.D.C. 2014) (citation omitted). "Nevertheless, the plaintiff is not relieved of h[er]

obligation to support h[er] allegations with competent evidence." *Id*. "As in any context, where

the plaintiff will bear the burden of proof at trial on a dispositive issue, at the summary judgment

stage, he bears the burden of production to designate specific facts showing that there is a

genuine dispute requiring trial." *Mason v. Geithner*, 811 F. Supp. 2d 128, 175 (D.D.C. 2011)

(citing *Ricci v. DeStefano*, 557 U.S. 557, 585 (2009)).

### B.   Retaliation Under Title VII

Title VII protects federal employees from retaliation for having asserted their

rights. *See* 42 U.S.C. § 2000e-16(a). To prove unlawful retaliation under Title VII, an employee

must establish three elements: (1) that she made a charge or opposed a practice made unlawful

by Title VII; (2) that the employer took a materially adverse action against her; and (3) that the

employer took the action because of her protected conduct. *Allen v. Johnson*, 795 F.3d 34, 39

(D.C. Cir. 2015) (citing *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012)). The second

two elements differ from their discrimination counterparts in important respects.

Retaliatory conduct need not reach the same level of adversity as discriminatory

conduct. *See generally Mogenhan v. Napolitano*, 613 F.3d 1162, 1165-66 (D.C. Cir. 2010)

(citing *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 60-61, 67-68 (2006)). In

other words, "Title VII's substantive [discrimination] provision and its anti-retaliation provision

are not coterminous" because the "scope of the anti-retaliation provision extends beyond

workplace-related or employment-related retaliatory acts and harm." *Steele v. Schafer*, 535 F.3d

689, 695 (D.C. Cir. 2008) (quoting *Burlington N.*, 548 U.S. at 67). So instead of "affecting the

terms, conditions, or privileges of employment," as discrimination must, retaliatory conduct need only "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Mogenhan*, 613 F.3d at 1166 (quoting *Burlington N.*, 548 U.S. at 68). Nonetheless, this material adversity requires "more than 'those petty slights or minor annoyances that often take place at work and that all employees experience.'" *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (quoting *Burlington N.*, 548 U.S. at 68).

Retaliation also differs from discrimination in its causation: retaliation claims must be proved according to traditional principles of but-for causation. *Univ. of Tex. SW Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013) ("[A] plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."). Thus, there is no "mixed motive" retaliation. *Cf. EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015) (contrasting *Nassar*'s but-for standard in the retaliation context with the more "relaxe[d]" standard in Title VII's mixed-motive discrimination provision, 42 U.S.C. § 2000e-2(m)). However, but-for causation does not mean that retaliation must be the *only* cause of the employer's action—merely that the adverse action would not have occurred absent the retaliatory motive. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 & n.5 (2d Cir. 2013) (citing *Fowler V. Harper et al., 4 Harper, James and Gray on Torts* § 20.2, at 100–101 (3d ed.2007) (collecting cases); W. Page Keeton et al., *Prosser and Keeton on Torts* § 41, at 264–66 (5th ed.1984)); *accord Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014).

Finally, retaliation claims based only on circumstantial evidence are subject to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Allen*, 795 F.3d at 39. The *McDonnell Douglas* framework proceeds as follows.

The plaintiff must first make a prima facie case (1) that she is a member of a protected class; (2) that she suffered materially adverse action; and (3) that the unfavorable action gives rise to an inference of retaliation. *Youssef v. F.B.I.*, 687 F.3d 397, 401-02 (D.C. Cir. 2012); *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002); *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999). The burden then shifts to the defendant, which must "articulate some legitimate, non[retaliatory] reason" for its action. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If it does, then the plaintiff must show by a preponderance of the evidence that the reasons advanced by the employer were merely a pretext to hide retaliation. *Id.*[3]

On a motion for summary judgment, once an employer articulates a legitimate, non-discriminatory reason for its action(s), the plaintiff's prima facie case is only relevant in the

---

[3] The D.C. Circuit has recently expounded upon the "multiple ways in which circumstantial evidence may support an inference that an employer's stated reason for a challenged employment action was not the actual reason," and that the real reason was prohibited discrimination or retaliation:

> The temporal proximity of an adverse action close on the heels of protected activity is a common and highly probative type of circumstantial evidence of retaliation. *See Hamilton* [*v. Geithner*], 666 F.3d [1344,] 1357-59 [(D.C. Cir. 2012)]. Other common ways of proving invidious motive—whether retaliation or discrimination—include pointing to evidence that the employer treated other, similarly situated employees better; that the employer is "lying about the underlying facts" of its decision; that there were "changes and inconsistencies" in the employer's given reasons for the decision; that the employer failed to "follow established procedures or criteria"; or that the employer's "general treatment of minority employees" (or, in the retaliation context, employees who asserted their Title VII rights) was worse than its treatment of non-minorities (or employees who did not assert their Title VII rights). *Brady* [*v. Office of Sergeant at Arms*], 520 F.3d [490,] 495 & n. 3 [(D.C. Cir. 2008)]. Invidious motive may also be inferred from "'an error too obvious to be unintentional.'" *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 26 (D.C. Cir. 2013) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

*Allen v. Johnson*, 795 F.3d 34, 40 (D.C. Cir. 2015).

context of the evidence as a whole. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494

(D.C. Cir. 2008). "[I]n considering an employer's motion for summary judgment or judgment as

a matter of law in those circumstances, the district court must resolve one central question: Has

the employee produced sufficient evidence for a reasonable jury to find that the employer's

asserted non-discriminatory reason was not the actual reason and that the employer intentionally

discriminated against the employee on the basis of race, color, religion, sex, or national origin?"

*Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08, 511 (1993); *U.S. Postal Serv.*

*Bd. of Governors v. Aikens*, 460 U.S. 711, 714-16 (1983)).

### C. Retaliation Under the Equal Pay Act

The EPA itself does not prohibit retaliation against employees for filing claims.

However, Section 15(a)(3) of the Fair Labor Standards Act (FLSA) makes it unlawful "to

discharge or in any other manner discriminate against any employee because such employee has

filed any complaint or instituted or caused to be instituted any proceeding under or related to this

chapter." *See* 29 U.S.C. § 215(a)(3). That chapter, as amended, includes the EPA's prohibition

on gender-based wage discrimination. An EPA claimant who suffers retaliation may therefore

seek relief under the FLSA's anti-retaliation provisions.

Courts essentially equate the elements of retaliation under the FLSA with those

under Title VII. *Benton v. Laborers' Joint Training Fund*, No. 14-cv-1073, 2015 WL 4736028,

at *8 n.9 (D.D.C. Aug. 10, 2015) ("Because the elements of a prima facie case of retaliation are

essentially identical under the FLSA and Title VII, . . . Title VII case law is instructive here.")

(quoting *Cooke v. Rosenker*, 601 F. Supp. 2d 64, 73 (D.D.C. 2009)). To establish a retaliation

claim under the FLSA, "a plaintiff is required to show that[:] (1) he made an FLSA complaint or

otherwise engaged in protected conduct; (2) the defendant was aware that he had engaged in

protected activity; (3) the defendant took an action that was materially adverse to the complainant and sufficient to dissuade a reasonable employee from further protected activity; and that (4) there was a causal relationship between the two." *Del Villar v. Flynn Architectural Finishes, Inc.*, 893 F. Supp. 2d 201, 213 (D.D.C. 2012) (citing *Caryk v. Coupe*, 663 F. Supp. 1243, 1253 (D.D.C. 1987)).

Absent direct evidence, retaliation claims under FLSA are subject to the burden-shifting framework of *McDonnell Douglas*, as described above. *Wood v. SatCom Mktg., LLC*, 705 F.3d 823, 828 (8th Cir. 2013).

### G.  Administrative Exhaustion: the EEO Process and Timeliness

Federal employees must exhaust their administrative remedies before filing suit under Title VII. *Koch v. Walter*, 935 F. Supp. 2d 164, 169 (D.D.C. 2013) (citing 29 U.S.C § 633a(b)-(d); 42 U.S.C. § 2000e-16(c); *Payne v. Salazar*, 619 F.3d 56, 58 (D.C. Cir. 2010)).  The same process applies to claims brought under Title VII, the ADEA, and the Equal Pay Act.  29 C.F.R. § 1614.103(a).  Although the *process* applies to all three statutes, however, there is no administrative-exhaustion requirement for allegations of retaliation under the Equal Pay Act. Such claims may be brought in federal court under Section 16(b) of the FLSA, 29 U.S.C. § 216(b), anytime within two years of the alleged violation (or within three years if the violation was willful).  *Compare* 29 C.F.R. § 1614.407 *with id.* § 1614.408.

The process required by Title VII begins when a federal employee contacts an EEO counselor, which must be done within 45 days of a discrete act that is allegedly retaliatory. *Id.* § 1614.105(a)(1); *see also Woodruff v. Peters*, 482 F.3d 521, 527 (D.C. Cir. 2007).  If the matter is not resolved through counseling, the employee must timely file an administrative complaint with the agency.  29 C.F.R. § 1614.106(a)-(c).  After the agency has the opportunity to

11

investigate the matter, the complainant may demand either an immediate final decision from the agency or a hearing before an EEOC administrative judge. *Id.* §§ 1614.106(e)(2), 1614.108(f). A complainant may file a civil action within 90 days of receipt of the final decision from the agency or at any time after a complaint has been pending for at least 180 days. *Id.* § 1614.407.

The administrative filing requirement applicable to federal employees "essentially functions as a statute of limitations for Title VII actions." *Carter v. Wash. Metro. Area Transit Auth.*, 503 F.3d 143, 145 (D.C. Cir. 2007). Because untimely exhaustion of administrative remedies is an affirmative defense, a defendant bears the burden of proof. *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) (citing *Brown v. Marsh*, 777 F.2d 8, 13 (D.C. Cir. 1985)). "Filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). The exhaustion requirement "should never be allowed to become so formidable a demand that it obscures the clear congressional purpose of rooting out every vestige of employment discrimination within the federal government." *Brown*, 777 F.2d at 14 (quotation marks and alterations omitted). Thus, the requirement that a federal employee contact an EEO counselor within 45 days of a discriminatory act can be equitably tolled. *Steele v. Schafer*, 535 F.3d 689, 693 (D.C. Cir. 2008) (citing *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003)).[4]

---

[4] Equitable tolling under Title VII for federal employees functions as it does for employees in the private sector. *See Gantt v. Mabus*, 857 F. Supp. 2d 120, 128 (D.D.C. 2012) (citing *Zipes*, 455 U.S. at 393-94); *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95-96 (1990)). The invoking litigant bears the burden of establishing two elements: (1) that she has been pursuing her rights diligently, and (2) that some extraordinary circumstance stood in her way. *Gantt*, 857 F. Supp. 2d at 128 (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Tolling is to be "exercised only in extraordinary and carefully circumscribed instances." *Mondy v. Sec'y of the Army*, 845 F.2d 1051, 1057 (D.C. Cir. 1988).

Administrative exhaustion applies differently to "continuing" violations than to "discrete" violations.  *See generally Nat'l R.R. Corp. v. Morgan*, 536 U.S. 101 (2002).  Under the continuing-violation doctrine articulated in *Morgan*, "if the alleged acts constitute one similar pattern or practice and at least one illegal act took place within the filing period, then the complaint of discrimination is not time-barred and acts outside the statutory period may be considered for purposes of liability."  *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 368 (D.C. Cir. 2007) (quoting *Singletary v. Dist. of Columbia,* 351 F.3d 519, 526 (D.C. Cir. 2003)) (internal quotation marks and citation omitted).  The legal principle is subject to "two crucial limiting principles."  *Mayers*, 478 F.3d at 368.  First, it does not apply to "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire" because "[e]ach incident of discrimination and each retaliatory adverse employment action constitutes a separate actionable 'unlawful employment practice.'"  *Id.* (quoting *Morgan*, 536 U.S. at 114).  Second, the plaintiff alleging a continuing violation must "must allege that at least one 'act contributing to the claim occur[red] within the filing period.'"  *Mayers*, 478 F.3d at 368 (quoting *Morgan*, 536 U.S. at 117).

### III.  ANALYSIS

The alleged retaliatory acts are recited above and are found in paragraphs 11-20 of the Amended Complaint.  The Board argues that all of Ms. Farzam's allegations should be dismissed, because they are untimely or because they fail as a matter of law.  In support of the latter, the Board argues that Ms. Farzam has failed to demonstrate (1) a materially adverse employment action; or (2) a causal connection between her prior EEO activity and the alleged retaliation (insofar as none of the alleged retaliators knew of her prior protected activity).

### A.  Preliminary Matters

The Court first addresses Ms. Farzam's objection to the declaration of Steven Springer, submitted by the Board.  Mr. Springer was not identified by the Board in its Rule 26(a)(1) disclosures, as someone "likely to have discoverable information . . . that [the Board] may use to support its claims or defenses."  Fed. R. Civ. P. 26(a)(1)(A)(i).  The Board concedes as much, but rejoins that Mr. Springer "did not provide testimony regarding the factual allegations underlying Plaintiff's Complaint."  Pl. Reply [Dkt. 60] (Reply) at 15.  Because the Rule plainly encompasses information that may be used to support any *defenses*, that argument fails.  And because Mr. Springer's name was never disclosed to Ms. Farzam, she did not seek to depose him.  It would prejudice Ms. Farzam to admit such testimony at this juncture, and the Court will therefore disregard the Springer Declaration, Def. Mem., Ex. 4 [Dkt. 56-4].

Witnesses other than Mr. Springer uniformly testified, however, that editors had discretion over which stories to approve and which reporters to assign at Persian News Network and Ms. Farzam does not disagree or offer contradicting evidence.  Sheila Gandji, a Director of the PNN, testified that "stories are pitched and they are vetted by the editorial group."  Dep. of Sheila Gandji, Mot., Ex. 1 [Dkt. 56-1] (Gandji Dep.) Tr. at 153:4-153:15.  Maja Drucker, another Director of PNN, affirmed that "an editor has the last word as to what will be part or not be a part of any given program."  Dep. of Maja Drucker, Mot., Ex. 6 [Dkt. 56-6] (Drucker Dep.) Tr. at 25:8-26:1.  In addition, Seyed Ali Sajjadi, a Senior Managing Editor of "News and Views," stated that the editor "is responsible for everything [that] goes on air," and also "is in charge of using the resources in the best possible way."  Dep. of Seyed Ali Saijadi, Mot., Ex. 10 [Dkt. 56-10] (Saijadi Dep.) Tr. at 112:5-112:11.  Further, Joy Wagner testified that this is "[t]he way it works in every newsroom that I've ever worked in."  Dep. of Joy Wagner, Mot., Ex. 2 [Dkt. 56-2] (Wagner Dep.) Tr. at 152:14-153:4.

Second, the Court will dismiss two bases for retaliation, alleged in the Amended Complaint but since withdrawn.  Ms. Farzam now concedes that "the requirement that Plaintiff undergo training in November[] 2010" was not a retaliatory act.  *See* Opp'n at 49; Am. Compl. ¶ 18.  She also admits that the "failure to select Plaintiff for a GS-13 Broadcaster position for which she applied in September 2009" does not present a timely cause of action because it was not administratively exhausted.  *See* Opp'n at 49; Am. Compl. ¶ 22.  These allegations will be dismissed.

Third, Ms. Farzam did not respond to the Board's arguments as to other allegations, thereby waiving them.  *Texas v. United States*, 798 F.3d 1108, 1110 (D.C. Cir. 2015) (citing Local Civil Rule 7(b); *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014)).  The Court will dismiss, therefore, the allegation that the Persian News Network retaliated against Ms. Farzam when it failed to broadcast her "report on a news conference held by First Lady Michelle Obama," Am. Compl. ¶ 14.

Finally, the parties seem to have strayed outside the pleadings.  There are references by both sides to allegations that are not made in the Amended Complaint.  Only those claims in the Amended Complaint are before the Court.  *Jo v. Dist. of Columbia*, 582 F. Supp. 2d 51, 64 (D.D.C. 2008) ("It is well-established in this district that a plaintiff cannot amend his Complaint in an opposition to a defendant's motion for summary judgment."); *Sharp v. Rosa Mexicano, D.C., L.L.C.,* 496 F.Supp.2d 93, 97 n. 3 (D.D.C. 2007) (stating that plaintiff may not, "through summary judgment briefs, raise [ ] new claims . . . because [the] plaintiff did not raise them in his complaint"); *accord Gilmour v. Gates, McDonald and Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004) (holding that claims raised for the first time in an opposition to a motion for summary judgment are not properly before the court).  In this case, Counts I and II expressly

confine themselves to paragraphs 7-20 of the Amended Complaint; hence, no other allegations will be addressed.[5]

### B. Administrative Exhaustion

The Board argues first that many of Ms. Farzam's claims were not exhausted in the pre-suit administrative process.[6]

As noted above, the administrative process applies only to retaliation claims under Title VII. The Board's motion must be denied, therefore, to the extent it seeks to dismiss claims of retaliation under the Equal Pay Act (Count I). Those claims may be brought under 29 U.S.C. § 216(b) within two years of the violation, or within three years if the violation was willful, regardless of whether the EEO process was pursued. *See* 29 U.S.C. § 255(a); 29 C.F.R. § 1614.408. The Board makes no statute-of-limitations argument as to the Equal Pay Act retaliation claims.

"Federal employees must exhaust their administrative remedies before filing suit" under Title VII. *Mills v. Winter*, 540 F. Supp. 2d 178, 184-85 (D.D.C. 2008). "Dismissal is required when a plaintiff fails to exhaust [her] administrative remedies with respect to particular claims." *Ndondji v. InterPark, Inc.*, 768 F. Supp. 2d 264, 276-77 (D.D.C. 2011) (citing *Rann v.*

---

[5] Paragraphs 7-9 merely recount Ms. Farzam's prior EEO activity, and do not allege any retaliatory acts on the Board's part. Those acts are alleged in ¶¶ 10-20.

[6] Specifically, the Board moves to dismiss the following allegations: (1) that "on approximately July 7, 2008, and up until several months ago, Plaintiff's efforts to initiate work projects . . . were in numerous instances resisted" (Am. Compl. ¶ 11); (2) that "on approximately July 7, 2008, she was not allowed to travel to cover domestic conferences . . ." (*Id.* ¶ 12); (3) that "on approximately July 7, 2008, she was not provided audio equipment needed to do interviews" (*Id.* ¶ 13); (4) that "on approximately July 7, 2008, and up until several months ago, BBG failed to broadcast reports Plaintiff prepared . . ." (*Id.* ¶ 14); (5) that "[i]n approximately November of 2008, PNN created a special committee for covering inauguration issues but did not even appoint Ms. Farzam as a committee member . . ." (*Id.* ¶ 15); and (6) that PNN did not renew her press credentials to cover the White House, State Department, and Congress in February 2009, March 2009, and April 2009, respectively. (*Id.* ¶ 16).

*Chao*, 346 F.3d 192, 194-95 (D.C. Cir. 2003)).  In this case, Ms. Farzam first contacted an EEO

counselor on August 18, 2010.  Many of the alleged retaliatory acts, by their own terms, occurred

in 2008 and 2009—one or two years before her initial EEO contact.  *See generally* Am. Compl.

¶¶ 7-16.  A federal employee complaining of discrimination must contact an EEO counselor

within 45 days of the date of the alleged retaliatory action.  *See* 29 C.F.R. § 1614.105(a)(1); 29

C.F.R. § 1614.106(a)-(c); *Mills*, 540 F. Supp. 2d at 184-85.  Ms. Farzam makes no argument that

VOA failed to notify its employees of these requirements.

### 1.  Waiver

Ms. Farzam asks the Court to ignore the Board's argument that she failed to

exhaust her administrative remedies because it waived the argument when it accepted and

investigated her claims.

Contrary to her argument, it is well established that "agencies do not waive a

defense of untimely exhaustion merely by accepting and investigating a discrimination

complaint." *Bowden v. United States*, 106 F.3d 433, 438 (D.C. Cir. 1997) (citing *Brown v.

Marsh*, 777 F.2d 8, 15 (D.C. Cir. 1985)).  Ms. Farzam maintains that the Board did much more

than "merely" accept and investigate her case, urging that "the administrative process went

forward."  Opp'n at 8.  And indeed it did, for more than a year, until at last it was scheduled for a

hearing before an EEOC Administrative Judge in November 2011 at the EEOC's office in San

Antonio, Texas.  *Id.* at 9.  "Finding that transfer unacceptable," *id.*, Ms. Farzam abandoned the

administrative process.  Thus, if the Board failed to issue a final decision—either accepting or

rejecting the AJ's opinion—the administrative process was pretermitted because of Ms. Farzam's

voluntary action.  Waiver is an equitable defense, *Rann v. Chao*, 346 F.3d 192, 195 (D.C. Cir.

2003), and Ms. Farzam has provided no basis to find that the equities favor her.

17

### 2. Exhaustion

The law is clear that a federal employee must contact an EEO Counselor within 45 days of a discriminatory act or she could lose the legal right to complain.  29 C.F.R. §§ 1614.105(a)(1), 1614.106(a)-(c).  Congress adopted this timeline in order to ensure that federal agencies have very quick notice of EEO complaints, so that they might be timely investigated and, if meritorious, resolved without litigation.  *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 398 (1982); *Bowdre v. Richardson*, 131 F. Supp. 2d 179, 186 (D.D.C. 2001).  Ms. Farzam does not dispute these strictures but advances two arguments concerning events that happened before July 3, 2010.[7]  First, she argues that she was a victim of a continuing violation and that her seemingly late allegations were actually timely.  Second, she contends that she can nonetheless offer evidence concerning untimely allegations to support her timely claims of retaliation.

Ms. Farzam grounds both arguments in *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002).  In *Morgan,* the Supreme Court differentiated between "continuing violations" and "serial violations."  *Id.* at 114.  As relevant here, the Supreme Court directly instructed that when discriminatory or retaliatory acts are *discrete*, they must be the subject of separate complaints—even if the complained-of acts are related.  In other words, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act."  *Id.* at 113.  Thus, discrete acts that Ms. Farzam alleges were retaliatory, but that occurred before July 3, 2010, are no longer subject to suit.

The Court concludes that all of the acts of retaliation alleged by Ms. Farzam that pre-date July 2010 were of a discrete nature and are not actionable—with one exception,

---

[7] This is 45 days prior to August 18, 2010, omitting July 4 (a federal holiday).

addressed below.  For example, the denial of permission to cover certain news conferences, Am.

Compl. ¶ 12, was a discrete and identifiable event.  So, too, was the denial of audio equipment

"on approximately July 7, 2008."  *Id.* ¶ 13.  Each of the reports that the Board "failed to

broadcast," *id.* ¶ 14, was denied at a discrete time—indeed, many of them are individually named

in the Amended Complaint.  Similarly, excluding Ms. Farzam from a specific committee, *id.* ¶

15, and denying her press credentials on specific dates, *id.* ¶ 16, were all discrete in nature.  None

of these alleged acts can said to be "continuing."

      Ms. Farzam's argument to the contrary evidences a misreading of *Morgan*.  She

argues that the term "discrete acts" only countenances "those which altered (or maintained) an

employee's fundamental employment status."  Opp'n at 5.  As the Board points out, Ms. Farzam

cites no support for this proposition.  And contrary to Ms. Farzam's argument, *Morgan* merely

gave examples of certain discrete acts that "are easy to identify," such as termination and failure

to promote.  536 U.S. at 114.  That list was not exclusive, nor did it illustrate any unifying theme

among discrete acts.  The full sentence from *Morgan* reads: "Discrete acts such as termination,

failure to promote, denial of transfer, or refusal to hire are easy to identify."  *Morgan*, 536 U.S. at

114.  At most, *Morgan* might be read to limit "discrete acts" to those that are "easy to identify."

*Id.*  But it leaves the door open to other discrete acts that can trigger the 45-day period.

      Ms. Farzam's reliance on *Mayers v. Laborers' Health & Safety Fund* is similarly

misplaced.  *See* Opp'n at 4-5 (citing 478 F.3d 364 (D.C. Cir. 2007)).  In *Mayers*, the D.C. Circuit

affirmed that *Morgan* limits a plaintiff's invocation of the continuing-violation doctrine to

"claims that by their nature occur not 'on any particular day' but 'over a series of days or perhaps

years.'"  *Mayers*, 478 F.3d at 368 (quoting *Morgan*, 536 U.S. at 115).[8]  Each of the discrete acts

---

[8] It is not enough, as Ms. Farzam argues, that the alleged actions "are all in the nature of reducing

relied on by Ms. Farzam, listed above, "occurred on the day that it happened." *Morgan*, 536

U.S. at 110.  Indeed, some of those dates are precisely identified in the Amended Complaint.

None of the alleged acts can be said only to have "occurred" over a course of time.

      One alleged violation, however, is not discrete in nature: the allegation that the

Board engaged in a general refusal to give Ms. Farzam assignments or to let her pursue her

desired stories.  Am Compl. ¶ 11.  None of those refusals may have, on its own, been a discrete

retaliatory act—especially in light of the unrebutted evidence that editors exercised broad

discretion in assigning stories to various reporters.  But taken together, the repeated denial of

work to a single reporter may have constituted a "continuing violation" within the meaning of

*Morgan* and *Mayers*.

      In light of these repeated denials, the question becomes "when a reasonable

person would have been on notice that [her] employer engaged in acts of retaliation." *Farzam*,

905 F. Supp. 2d at 98; *see also Faison v. District of Columbia*, 664 F. Supp. 2d 59, 66 (D.D.C.

2009) ("[A] plaintiff may not rely on the continuing violation theory where she was aware of the

discriminatory conduct at the time it occurred.") (quoting *Schrader v. Tomlinson*, 311 F. Supp.

2d 21, 27 (D.D.C. 2004)).[9]

---

or diminishing Plaintiff's work responsibilities or work products or the use of such work products." Opp'n at 6.  The common effect of the acts does not bear on whether they were discrete.  *See Morgan*, 536 U.S. at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, *even when they are related to acts alleged in timely filed charges*.") (emphasis added).

[9] *See Vazquez-Rivera v. Figueroa*, 759 F.3d 44, 51 (1st Cir. 2014) ("The continuing violation doctrine is an equitable doctrine [applicable] where the discrimination is ongoing and filing is delayed 'because the claimant needed to experience a pattern of repeated acts before she could be expected to realize that the individual acts were discriminatory in nature.'" (quoting *Loubriel v. Fondo del Seguro del Estado*, 694 F.3d 139, 144 (1st Cir. 2012)); *Hawkins v. Hamlet, Ltd.*, 296 F. App'x 918, 920 (11th Cir. 2008) ("The continuing violation doctrine is based on 'the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated.'" (quoting *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1222 (11th Cir. 2001)).

On the uncontested facts, the Court has little doubt that a reasonable employee would have realized the possibility of retaliation before July 3, 2010.[10]  To this point, Ms. Farzam herself alleges that the "First Act of Retaliation" was the Board's failure to live up to its 2008 settlement agreement.  Am. Compl. ¶¶ 7-9.[11]  The allegedly retaliatory breaches occurred "soon []after" the settlement's effective date of March 26, 2008, and again "in July and August 2008."  *Id.* ¶ 7.  Many "Acts of Retaliation" alleged in the Amended Complaint began "on approximately July 7, 2008."  *Id.* ¶¶ 11-14, 16.  Without doubt, the Amended Complaint alleges that some of these acts continued "up until several months ago."  *Id.*  But the question is whether Ms. Farzam should reasonably have recognized that she was the target of illegal retaliation before then.  Ms. Farzam previously alleged retaliation, among other claims, and reached a settlement agreement.  In this 2010 lawsuit, she alleges that the settlement agreement was immediately violated by VOA in 2008 for retaliatory purposes, and almost immediately followed by further, allegedly retaliatory acts.  A reasonable employee, most particularly one who had previously alleged retaliation and knew the concepts, would have recognized her potential claim before July 3, 2010.

The Court concludes that Ms. Farzam should have acted sometime in the *two years* between the date on which she alleges retaliatory acts began and her complaint to an EEO counselor.[12]  On this record, although the repeated denial of assignments could be construed as a

---

[10] Ms. Farzam concedes that "a reasonable employee might come to believe at a time earlier than July 4, 2010 . . . that preceding acts were in retaliation for her EEO activities."  Opp'n at 7.

[11] Although the merits of this allegation will be decided by the Court of Federal Claims, as an allegation in the Amended Complaint, it remains probative of Ms. Farzam's awareness of possible retaliation.

[12] The 'subsequent' retaliation allegedly began on July 7, 2008.  Ms. Farzam complained to the EEO Counselor on August 18, 2010.  Am. Compl. ¶ 41.

continuing violation, Ms. Farzam cannot rely on that theory when she knew (or should have known) and acted on the alleged retaliation.  *Faison*, 664 F. Supp. 2d at 66; *Schrader*, 311 F. Supp. 2d at 27.

The Court will grant the Board's motion for summary judgment on all Title VII claims that were not timely brought to an EEO counselor.  *See* Am. Compl. ¶¶ 11-16.  The Court previously refrained from making this ruling "on the current record," not least because "Ms. Farzam [was] entitled to resolution of all doubts in her favor."  *Farzam*, 905 F. Supp. 2d at 98 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The record is now fully developed and there is no genuine dispute of material fact to present to a jury.

Nonetheless, Ms. Farzam correctly argues that the facts underlying her untimely allegations could "constitute relevant background evidence in a proceeding in which the status of a current practice is at issue."  *Morgan*, 536 U.S. at 113 (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977)).  Because the remainder of her claims also fail, however, the point becomes moot.

## C.  Summary Judgment as a Matter of Law

In addition to its administrative-exhaustion arguments, VOA seeks summary judgment for allegations as to which material facts are not in dispute.  The Court will address each of the allegations supporting Counts I and II in turn.[13]

### 1.  Reduced Responsibilities (Am. Compl. ¶ 11)

The Amended Complaint alleges that Ms. Farzam's efforts to "initiate work projects and undertake corresponding activities" were rebuffed, and that she was limited to

---

[13] As noted above, ¶ 10 of the Amended Complaint alleges merely presents a generalized accusation of "additional acts of retaliation," and will not be addressed.

translations and the preparation of packages for television following her return from Radio Farda in July 2008 and thereafter. *See, e.g.*, Am. Compl. ¶ 11. She claims that this limited work represented a connected series of retaliatory actions in response to her EEO complaint and settlement. *See id.* ¶ 11. Neither the Amended Complaint nor her Opposition to VOA's motion for summary judgment provides record facts to support these generalized claims. General statements in opposition are insufficient at the stage of summary judgment. *Coleman v. Johnson*, 19 F. Supp. 3d 126, 133 (D.D.C. 2014) ("[T]he non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.") (citing Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986)). The general allegations in paragraph 11 will therefore be dismissed.

What is more, multiple deponents' sworn testimony—not contested by Ms. Farzam—describes a fluid assignment process at VOA, consistent with other 21st-century newsrooms.[14] Both former directors of the Persian News Network testified that editors would routinely deny reporters' requests to cover specific events. *See* Belida Dep. Tr. at 128:8-11; Drucker Dep. Tr. at 25:8-26:1. The Senior Managing Editor of "News and Views," to which Ms. Farzam was assigned in July 2008, testified that "if everybody wants to assign himself or herself to do what they want, it doesn't work. That's anarchy." Sajjadi Dep. Tr. at 112:5-112:11. This testimony is uncontested. The Court finds that VOA's change to a television format and need for coordinated reporting assignments suffice as a "legitimate nonretaliatory reason" for Ms.

---

[14] Ms. Farzam argues that the Board's description of the "typical newsroom process" is "conclusory." Opp'n at 39. Her argument overlooks the admissible, firsthand testimony from numerous witnesses whose testimony supports the Board's proposition—none of which (except the Springer declaration) is challenged by Ms. Farzam.

Farzam's changed or reduced responsibilities.

Under *McDonnel Douglas*, Ms. Farzam must show that VOA's legitimate, non-retaliatory reasons are really pretexts for retaliation. *Burdine*, 450 U.S. at 253; *Hairston v. Vance-Cooks*, 773 F.3d 266, 275 (D.C. Cir. 2014). Her pretext argument falls short. She contends that she received no assignments on certain days. Mr. Sajjadi testified that "the news room nature" was such that "[t]hat might happen to anybody," and that Ms. Farzam was not alone in that regard. Sajjadi Dep. Tr. at 105. Ms. Farzam offers no contrary admissible evidence to contradict Mr. Sajjadi's sworn testimony. Instead, she calls it "rank speculation and circular and conclusory reasoning," Opp'n at 40. Mr. Sajjadi, a senior managing editor on "News and Views," testified from firsthand knowledge; Ms. Farzam offers no facts to dispute his testimony. Argument from her counsel does not suffice.

Summary judgment on the allegations in paragraph 11 would therefore be entered in favor of the Board even if the claims were timely brought.

## 2. Denial of Permission to Attend Conferences (Am. Compl. ¶ 12)

Two specific incidents of retaliation are alleged by Ms. Farzam in this paragraph: the failure of Persian News Network to send her to the G-8 economic conference in Italy in June 2009 and to the G-20 economic conference in Pittsburgh in September 2009. Am. Compl. ¶ 12. Ms. Farzam did not complain about these non-assignments until more than a year after the fact, making her allegations stale, well beyond the 45-day period in which she should have contacted an EEO counselor (presuming that she might only suspect retaliation at the second denial), and therefore untimely.

Ms. Farzam does not explain why her non-assignment to either conference constituted a material adversity. Material adversity supporting a claim of retaliation is meant "to separate significant from trivial harms." *Burlington Northern*, 548 U.S. at 68. The challenged

act must be of the sort that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.*, 538 U.S. at 68 (quotation marks omitted).  Ms. Farzam argues only that neither Ms. Katz nor Mr. Saijadi "inquire[d] or investigat[ed] as to Plaintiff's past experience while at Radio Farda and before in covering foreign and domestic political and diplomatic conferences."  *See* Opp'n at 32-34.  Her argument does not demonstrate a materially adverse effect from her inability to attend the conferences.

Nor does Ms. Farzam adequately rebut VOAs proffered, nonretaliatory explanation: that "the Agency chose to send a reporter who had a reputable on-air personality." Mot. at 33-34.  In response, Ms. Farzam again protests that nobody looked at her resume to see whether she was a better candidate.  *See* Opp'n at 32-33 ("It appears that . . . Ms. Katz did not inquire or investigate as to Plaintiff's past experience . . . .  And Mr. Belida admitted he made no effort to find out Plaintiff's work experience . . . at least suggesting that no one, including Mr. Sajjadi, informed him of it.").  She describes these "failures to inquire and report" as "pretextual" evidence of retaliation but offers no facts that support that assertion.  Nor does she substantiate her claims of "personal animus" or "biased approaches" by Ms. Katz or Mr. Sajjadi.  Opp'n at 34.  Because she cannot demonstrate that VOA's reason was pretextual, summary judgment would be entered in favor of VOA on this claim, were it timely.[15]

### 3.  Denial of Audio Equipment (Am. Compl. ¶ 13)

---

[15] The Board also argues that none of the alleged retaliators knew of Ms. Farzam's prior EEO activity.  To be sure, knowledge of prior protected activity by an alleged retaliator is a crucial element of Ms. Farzam's claims of retaliation, on which she would carry the burden at trial. *See Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009) ("We agree that Jones's supervisors could not have retaliated against him unless they had knowledge of his protected activity.").  The testimony in the record is not as clear as the Board may suggest.  The Court need not address the depositions and affidavits here, however, because Ms. Farzam's claims fail for other, independent reasons.

Ms. Farzam complains that VOA refused to provide her "audio equipment needed to do interviews."[16]  Am. Compl. ¶ 13.  VOA rejoins that such audio equipment was not issued to individual *television* reporters, who would be filming for broadcast.  Mot. at 54 (citing Jonas Dep. Tr. at 52:20-53:7 ("It was very clear that she did not need a tape recorder to be a television reporter."); Gandji Dep. Tr. at 154-155 (explaining that neither at VOA nor at any of Mr. Gandji's other employers were television reporters assigned tape recorders)).  Ms. Farzam's request merely demonstrated her lack of familiarity with her new medium.  Nevertheless, tape recorders were available for television reporters should the need arise.  Mot. at 53 (citing Gandji Dep. Tr. at 139:8-139:19).  Indeed, Ms. Farzam cannot recall a single instance when she requested the use of a tape recorder and was denied.  Mot. at 55 (citing Farzam Dep. Tr. at 79:16-80:16).  Ms. Farzam has failed to demonstrate retaliation.

Ms. Farzam has not shown that VOA's failure to give her (or any other TV reporter) a personal tape recorder was pretext.  She points to an email where Ms. Katz wrote "Ha ha" concerning Ms. Farzam's request, but omits the critical accompanying passage: "NOBODY has a tape recorder."  *See* Katz Dep., Ex. 42.  Mr. Sajjadi's testimony that he once had audio equipment is not to the contrary because VOA's medium had changed from radio to television.  Ms. Farzam's evidence is insufficient to raise a material question of fact and avoid summary judgment, which therefore will be granted on this allegation.[17]

---

[16] The only timeframe connected to this allegation is a very unspecific "[a]fter" her return to the Persian News Network on July 8, 2008.  *Id.*  Clearly, Ms. Farzam did not contact an EEO counselor until 2010.  Therefore, this allegation is untimely and subject to dismissal on that ground, too.

[17] Both parties also address VOA's refusal to issue a cell phone to Ms. Farzam.  *See* Mot. at 52-53; Opp'n at 30-32.  This claim is not evident on the face of the Amended Complaint, however, which only alleges that Ms. Farzam was denied "audio equipment *needed to do interviews*."  Am. Compl. ¶ 13 (emphasis added).   For the reasons stated above, the Court will not consider any claim outside of the pleadings.

### 4.   Refusal to Renew Press Credentials For Ms. Farzam (Am. Compl. ¶ 16)

Ms. Farzam covered the White House during her four years at Radio Farda and had White House credentials to access the White House and to travel with the press corps on occasional presidential trips.  She also interviewed President George W. Bush in the White House in March 2008.  She anticipated that she would continue to report on the White House, State Department, and Congress upon her return to the Persian News Network in July 2008. That did not happen in the re-organized VOA, prompting Ms. Farzam to cry retaliation.  Were this claim timely, which it is not, it would be subject to dismissal in light of the undisputed facts.

After VOA became a television broadcaster, it reorganized its operations.  Instead of each of VOA's 45 constituent language services sending its own reporter to the White House, State Department, or Capitol Hill, those jobs were consolidated.  Mot. at 29 (citing Mahmoudi Dep. Tr. at 33:12-34:20).  For instance, two reporters in VOA's central news rooms went to the White House, when required, and shared their reports with the language specialists in English. The language services, including Persian News Network, then translated such parts of that news that each service chose to broadcast into the relevant language.

In the re-organized VOA, the Persian News Network had neither the need nor the resources to establish its own, redundant White House reporter when it could get English-language reports from VOA reporters working from the central news room.  *See* Gandji Dep. Tr. at 96:15-97 (explaining that "we do not need a White House correspondent for [the Persian News Network].  The White House was covered by our central news correspondent at that time.");

---

To the extent that Ms. Farzam alleges that a cell phone is "audio equipment" that is "needed to do interviews," she has provided no factual support.  VOA demonstrates a legitimate, nonretaliatory reason that it does not issue audio equipment (recorders or cell phones) to television reporters who are filmed or filming. Ms. Farzam offers no current facts to the contrary or evidence of pretext.

Belida Dep. Tr. at 45:11-46:10 ("White House news releases instantly popped up on the web [so] you don't really need to leave your office to observe them in realtime.").  VOA's internal re-organization, relieving the individual language services of the need to report from the White House, State Department, or Capitol Hill, provides a legitimate nonretaliatory reason for its failures to renew Ms. Farzam's credentials for those venues.

Ms. Farzam's response does not show a pretextual basis for VOA's otherwise-neutral actions.  Her argument is grounded primarily in alleged "personal animus" and "personal bias" on the part of her supervisors.  *See* Opp'n at 26-30.  She accuses Ms. Katz of using "immoderate, emotional and even nasty language" in derogation of Ms. Farzam.  Opp'n at 27. But none of the ensuing citations bears that out; each is a straightforward evaluation of her skills as a television reporter.  *Id.*[18]  The same is true of Mr. Sajjadi, who Ms. Farzam can only claim "made inconsistent statements about her performance and abilities."  Opp'n at 28.  The Court sees no such conflict; Mr. Sajjadi's modest praise and rating of "acceptable" hardly contradict his later surprise that Ms. Farzam was "rat[ed] as Outstanding in every category."  *Id.* at 29.

Because this claim is untimely and VOA has shown that its reorganization (which predated Ms. Farzam's return from Radio Free Europe) was entirely neutral as to Ms. Farzam's EEO and EPA complaints, summary judgment will be entered in favor of the Board.

---

[18] For example, Ms. Katz said that "Mrs. Farzam's opinion of her experience differs greatly from the actual level of her ability and work," that "Ms. Farzam does not have any TV camera skills of which I am aware" and that "there is little confidence in the quality of her work."  *Id.*  That is all straightforward analysis of a subordinate's performance and ability.

However, Ms. Katz did comment in an email that Ms. Farzam "is causing a lot of trouble lately." Opp'n Ex. 5 (11/2/2010 Email Chain) at 1.  The context of her comment relieves it of any retaliatory vibration:  Ms. Katz had just been told by Ms. Farzam, a subordinate, that she would rather not attend training that Ms. Katz had arranged for her.  Ms. Katz thought that Ms. Farzam needed the training "more than most," *id.*, and thus understandably viewed the refusal as causing trouble for her.

### 5.   Coverage of the 2009 Inauguration (Am. Compl. ¶¶ 14, 15)

This complaint encapsulates Ms. Farzam's broader distress upon her return to

Persian News Network.  As a radio reporter, she had credentials to critical federal venues and she

covered critical political issues.  When she came back to Persian News Network, she had to learn

an entire new medium (television) and, despite her assignment to the premier news telecast,

VOA's reorganization deprived her of access to critical places, people and stories.  To add insult

to injury, Persian News Network expected her to undergo training as a television reporter, when

she had been reporting on radio for many years.

Barack Obama was elected President of the United States in November 2008 and

was inaugurated in January 2009.  The Persian News Network formed a committee specifically

to cover the inauguration, "but did not even appoint Ms. Farzam as a committee member despite

the fact that she had previously done extensive reporting on presidential inaugurations."  Am.

Compl. ¶ 15.  Without authorization from an editor, Ms. Farzam nevertheless attended the

inauguration, gained access to the White House with her press pass, and prepared a report on

President-elect Obama's pre-inauguration visit with President Bush in the White House—

including exclusive photos that she took herself.  *See* Am. Compl. ¶ 14.  The report was not

aired, however, which Ms. Farzam claims was an act of retaliation.  *Id.*

 The Board answers that it did not televise Ms. Farzam's inauguration-day story

because it was not completed until the day after the inauguration, she had no video to accompany

it, and it was not a story to which she had been assigned.  Consistent with its prior planning, the

Persian News Network had carried out lengthy inaugural coverage on the day of the

inauguration.   Ms. Farzam complains that "it appears that most of the supervisory personnel

involved in the selection process were not made aware of Plaintiff's past experience," and that

Ms. Saijadi, who knew of her prior work, "did not bring it up." Opp'n at 35. Her argument does

not support her burden to show that the Board's proffered criteria were a mere pretext for

retaliation when it put someone other than Ms. Farzam on the planning committee and when it

declined to televise her inauguration report because it was late, had no video, and was not her

assignment.

   VOA has advanced additional reasons for assigning others to cover the

inauguration: the live broadcast was being simultaneously translated. According to Mr. Saijadi,

simultaneous translation is not something that Ms. Farzam does well. Sajjadi Dep Tr. at 61:7-15

("[Plaintiff] was not in the category to be able to report that. We need people to be able [to]

simultaneously translate what [the] chief justice was saying, what elected persons [were] saying

alongside to the White House and Congress. And Mrs. Farzam is not—we have only few

reporters that are able to do simultaneous translation."). Ms. Farzam was also junior to all

assigned reporters.

   In response, Ms. Farzam fails to show pretext or that VOA's alleged retaliatory

animus was a but-for reason for its assignment choices. Her insistence that she is a "good

translator" does not undercut VOA's judgment that she was not as good at *simultaneous*

translation, which she does not address. Ms. Farzam notes that some of the other reporters who

were assigned could not simultaneously translate, but does not address their seniority, relevant

experience, and assigned jobs. Covering the 2009 Inauguration of President Barack Obama was

clearly a "plum" assignment and VOA has presented legitimate nonretaliatory reasons for its

choices. Ms. Farzam's prior EEO-protected activity was, most recently, the settlement of her

Equal Pay Act claim in March 2008, a full ten months before the inauguration. This timeframe

does not support an inference of discrimination and Ms. Farzam fails to show evidence that

retaliation was the but-for cause of VOA's assignments.  Judgment therefore will be entered in favor of the Board on this allegation.

### 6.  Denial of Request to Cover Congressional Press Conferences (Am. Compl. ¶ 17)

Ms. Farzam complains that in August 2010 she was denied the opportunity to cover Congressman Van Hollen's appearance at the National Press Club.  Am. Compl. ¶ 17.  Then in September 2010, she was denied the opportunity to cover a Question and Answer event with Senators Cornyn and Menendez.  *Id.*  These allegations are timely, as Ms. Farzam contacted the Board's Office of Civil Rights in August 2010 and timely filed an administrative complaint on November 19, 2010.  Am. Compl. ¶ 41.  They nonetheless fail in light of the undisputed facts.

The uncontradicted testimony is that Ms. Farzam made both of these requests too late and without enough prior planning.  *See* Sajjadi Dep. Tr. at 120-121 ("So she asked to cover an event without coming up with a plan for it. . . .  And it was too late to accommodate her request.  When you have to cover an event, you need to put together things like a camera person, like a light person, like all crews.").  Her late requests and lack of preparation for backup with a television crew constitute legitimate nonretaliatory reason for VOA's denial of Ms. Farzam's requests.

In response, she argues that VOA's explanation is "belied" by Exhibit 97 to her memorandum, Dkt. 61-1.  The exhibit is not the silver bullet that Ms. Farzam hopes.  It shows that in response to Ms. Farzam's 7:50 p.m. email asking to cover Congressman Van Hollen's press conference at 9:00 a.m. the next morning, the news desk conditioned its approval:

> [W]e agree that *if* you can confirm a sit down interview with Congressman Van Holen *and if* he is willing to talk about Iran *as well as* the Midterm elections we are happy to send you.  *But* if we are only going for the Press Conference then we agree that it's not something we necessarily need to cover.

*Id.* at 2 (emphasis added).  Ms. Farzam was unable to fulfill the conditions.  She omits the emphasized language from her argument and completely fails to address it.  The conditions for approval thus stand unrebutted, and Ms. Farzam has failed to show pretext.

Concerning the Cornyn-Mendez press conference, *see* Am. Compl. ¶ 17, Ms. Farzam again sought authorization too late in time.  *See* Sajjadi Dep Tr. at 129:9-130:7 ("But she also requested a night before—late at night before, 7:44—everything is closed—p.m. for our business in VOA. And everybody comes back next day.  So, basically, she sent her e-mail in a graveyard time that nobody can respond to it, nobody can do anything about it until the morning.").  She thus similarly failed to request the coverage in time, as confirmed by similarly uncontradicted testimony. *Compare* Mot. at 43-44 *with* Opp'n at 41.  This was a legitimate, non-retaliatory reason for denying her request, and Ms. Farzam has not shown otherwise.

The allegations that the Board retaliated against Ms. Farzam by denying her requests to cover certain political events on Capitol Hill will be dismissed.

### 7.  Cancellation of Report on Medal of Honor (Am. Compl. ¶ 19)

Ms. Farzam complains that on November 16, 2010, she "informed her supervisor that she had on her own initiative attended" a Medal of Honor presentation ceremony but her story was not broadcast.  Am. Compl. ¶ 19.  The Board answers that the ceremony was "not assigned" and "created without consultation with PNN's editors."  Mot. at 45.  In opposition, Ms. Farzam does not address this reason or try to show any pretext.  Instead, Ms. Farzam focuses exclusively on *who* decided not to air her report.  The Board asserts that Ms. Drucker was the relevant decision maker.  Ms. Farzam is "mystified" by that contention, and claims that the decision was made by Mr. Sajjadi.  Opp'n at 42.  The identity of the decisionmaker is not germane unless the act was retaliatory and the Board's explanation merely a pretext to hide its

32

intention to retaliate.  Planning its news programs, the editors at Persian News Network assign

stories and anticipate televising them.  The sudden insertion of an unassigned story—that was

neither an emergency nor expected—could cause havoc with the careful timing of television

newscasts.  Ms. Farzam overlooks the Board's explanation and thus fails to demonstrate that it

was either retaliatory or pretextual.

Summary judgment therefore will be granted to the Board on this claim.

### 8.  Relegation to Non-Essential Employee Status (Am. Compl. ¶ 20)

Finally, Ms. Farzam complains that in January 2011, her status was changed from

an "essential (emergency) employee" to a "non-essential employee."  Am. Compl. ¶ 20.  Her

understanding is that non-essential employees "can be subjected to reductions in force more

easily than essential employees."  *Id.*[19]  The Board does not argue that this claim should have

been exhausted, but does maintain that it fails as a matter of law.

Ms. Farzam quotes from an Office of Personnel Management (OPM) Handbook

for the proposition that "essential employees may be granted exceptions to the regular order of

employees' release due to 'undue interruption' of the agency's work."[20]  And indeed, an agency

is told to "consider the impact if a[n] essential employee[] is reached for a reduction in force

action."  *Id.*  This statement does not exempt the employee from a reduction in force forever but

"simply provides the agency with the option of postponing the action until a later date because of

workload considerations."  *Id.*  Even an essential employee will eventually be subject to a RIF in

---

[19] In her opposition memorandum, Ms. Farzam includes additional allegations, arguing that the term "essential" bearing "a measure of prestige" and carries with it "the opportunity, during emergency situations, of being in charge of all aspects of broadcasting a PNN program."  Opp'n at 43.

[20] Handbook Action Item 17(h), *available at* http://archive.opm.gov/Reduction_In_Force/agency_references/Handbook/rih02b98.asp (last visited December 11, 2015).

the absence of congressional funding or other interruption in agency operations.

At the same time, the Board may under-appreciate the importance of being "essential." To them, the term means an employee who must report to work during inclement weather. *See* Mahmoudi Dep. Tr. at 77:1-77:16 ("Essential people are if there is an earthquake, whatever, disaster, they have to come . . . nonessentials are those that when the weather or whatever happens . . . you can get unscheduled leave."); Drucker Dep. Tr. at 28:5-28:16 ("Essential personnel means if there is a cataclysmic weather problem outside, if it snows, if it rains, if it's a heat wave or what not [sic] and the government is closed [our employees] do not have to come to work unless they're designated essential personnel."). The testimony gives short shrift to the potential collateral consequences of being non-essential, such as the inability to work when the office closes for other reasons, such as a government shutdown. In such circumstances, the difference between essential (working without pay) and non-essential (not working without pay) employees may be of some consequence if Congress were later to fund, contrary to practice, salaries only for those who actually worked during a shut-down.

For purposes of a claim of retaliation, however, this Court finds that exclusion from the essential-employees list would be a "trivial harm[]," *Burlington Northern*, 548 U.S. at 68, and not materially adverse within the meaning of that opinion. Ms. Drucker testified that designation as non-essential had no bearing on job performance, pay, promotion, or assignments. Drucker Dep. Tr. at 82:9-83:16. Ms. Farzam marshals no facts to the contrary. The rare circumstance above, in which the distinction *could* become relevant, is purely speculative and remote.

In addition, the Board states that it designated the essential employees it did in a manner consistent with its bad-weather understanding: those identified were most geographically

34

proximate to the office and could multi-task well to keep operations going.  Ms. Farzam cites her prior experience in a "combined role of master of ceremonies, producer and editor of radio programs . . . in 2002 and 2003," Opp'n at 43, to challenge the Board's selections.  Her past experience on radio just does not carry the weight of recent experience in television.

The Court also finds that the Board's designation of essential employees in January 2011 was too long after Ms. Farzam's most recent protected EEO activity (ending in March 2008) to supply a causal connection in the absence of immediate evidence.  For all of these reasons, summary judgment will be granted to the Board on this allegation.

## IV.  CONCLUSION

Only Counts I and II (alleging retaliation) are left before this Court.  For the reasons stated above, after examining each claim in the Amended Complaint and the record evidence adduced in support of them, the Court finds that they are either untimely, have no merit, or both.  The Board's motion for summary judgment [Dkt. 56] will be granted and judgment will be entered in the Board's favor.  A memorializing order accompanies this memorandum opinion.